# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| CONTINENTAL RESOURCES, INC., | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. CIV-20-200-PRW |
| WOLLA OILFIELD SERVICES LLC, JASON WOLLA | ) ) ) |
| Defendants. | ) ) |

## COMPLAINT

Plaintiff Continental Resources, Inc., (hereinafter "Continental") files this Complaint against Defendants Wolla Oilfield Services LLC ("Wolla Oilfield") and Jason Wolla (collectively "Wolla"), and alleges as follows:

## INTRODUCTION

1. This action involves a systematic scheme by Wolla Oilfield and Jason Wolla to bilk Continental out of millions of dollars. Under a contract between the parties, Wolla Oilfield agreed to provide Continental with hot oil services for its wells in North Dakota with the work to be paid on an hourly basis.

2. Instead, Wolla Oilfield and Jason Wolla consistently billed Continental for work that Wolla Oilfield did not perform at all. As discussed in detail below, Wolla Oilfield and Jason Wolla violated the parties' contract and numerous other laws, and both Defendants are liable to Continental for the damages they have caused.

{S537361;}

## PARTIES

3. Continental is an Oklahoma corporation with its principal place of business in Oklahoma City, Oklahoma.

4. Wolla Oilfield Services is a limited liability corporation organized under the laws of North Dakota, with its principal place of business in North Dakota. Upon information and belief, Wolla Oilfield's members are Jason Wolla and Samantha Oyloe, both of whom reside in North Dakota.

5. Upon information and belief, Jason Wolla is Wolla Oilfield's owner and manager, and is a resident of North Dakota.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964. Furthermore, the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 since the matter in controversy exceeds $75,000 and is between citizens of different states. This Court has supplemental jurisdiction over the state law claims asserted in this Complaint pursuant to 28 U.S.C. § 1367.

7. This Court has personal jurisdiction over Wolla Oilfield because Wolla Oilfield consented to the jurisdiction of this Court in a contract between the parties.

8. The Court has personal jurisdiction over Jason Wolla under the nationwide service of process provision found in 18 U.S.C. § 1965(b). Furthermore, this Court has personal jurisdiction over Jason Wolla because Jason Wolla purposefully directed his

activities at Continental in Oklahoma, and this litigation arises out of those actions directed to Oklahoma.

9. Venue is proper in this district because Wolla Oilfield has consented to this venue in a contract between the parties. Furthermore, venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this claim (*e.g.*, the receipt and payment of fraudulent invoices) occurred in the Western District of Oklahoma.

## GENERAL ALLEGATIONS

The Master Service Contract

10. On April 4, 2016, Continental and Wolla Oilfield entered into a Master Service Contract (the "MSC," attached hereto as Exhibit 1). Pursuant to the MSC, Wolla Oilfield agreed to provide hot oil services for Continental's oil wells in North Dakota.

11. Hot oil service is a necessary part of oil and gas production. During the hot oil service process, blockages in the wells are cleared and prevented by circulating heated fluid into the piping, tubing, pipelines, or tanks associated with the wells. Hot oil service is performed using hot oil trucks that are capable of heating and circulating the fluid used in the process. Hot oil trucks are driven by individuals employed by Wolla Oilfield.

12. Under the MSC, Wolla Oilfield agreed to charge Continental an hourly rate for the hot oil services provided to Continental (*see* Rate Sheet, attached hereto as Exhibit 2). Pursuant to § 9.3 of the MSC, Wolla Oilfield agreed to submit its invoices to Continental for approval and payment in Oklahoma using an online system called OpenInvoice. Wolla Oilfield attached invoices and work tickets its employees prepared to these online invoices as supporting documentation.

13. Pursuant to § 15.1 of the MSC, Wolla Oilfield agreed all invoices, financial settlements, billings and reports submitted to Continental would accurately reflect the work done, and that those documents would be complete and accurate, and that it would conduct its operations in accordance with all applicable laws, rules, and regulations.

14. Under applicable law and the MSC, Wolla Oilfield was required to comply with U.S. Department of Transportation ("DOT") regulations including, among other things, regulations prohibiting drivers from driving for more than 14 consecutive hours after coming on duty.

Wolla's Fraudulent Billing Scheme

15. From January 2017 to the beginning of December 2019, Wolla Oilfield billed Continental on a biweekly basis for each well for hot oil services it allegedly performed. During that time, Wolla Oilfield billed Continental for approximately $7.7 million.

16. In September 2019, Continental learned Wolla Oilfield and its owner, Jason Wolla, had been engaging in a brazen scheme to defraud Continental out of millions of dollars. At that time, an employee in Wolla Oilfield's accounting department contacted Continental and disclosed that Wolla Oilfield was systematically overbilling Continental and its other customers for the work it was allegedly performing (the "Whistleblower"). This Whistleblower explained that Wolla Oilfield was training its hot oil truck drivers to manipulate their time entries to overbill Wolla Oilfield's customers without being detected, and that these employees were incentivized to engage in this fraudulent behavior because

they were paid for each hour they billed to a customer, regardless of whether they were actually working.

17. These fraudulent overbilling activities were directed by Wolla Oilfield's upper management. Among other things, Jason Wolla directed employees not to put contemporaneous time stamps on work tickets or use GPS trackers so as not to draw attention to their business and billing practices. He also directed Wolla Oilfield's accounting department to inflate the hours accounting department employees assigned to certain employees.

The Continental Audit

18. As result of the information provided by the Whistleblower, Continental initiated an audit of Wolla Oilfield's records, pursuant to the MSC. The audit was conducted in October and November of 2019.

19. During the audit, representatives from Continental met with Wolla Oilfield employees and Jason Wolla. During the audit meetings, Wolla Oilfield and Jason Wolla claimed Wolla Oilfield had extensive back office personnel handling the accounting and billing, that another oil producer had audited Wolla Oilfield and found no issues, and repeatedly assured Continental Wolla Oilfield's business practices were proper and legitimate.

20. On October 22, 2019, Jason Wolla assured Continental's auditors the time Wolla Oilfield billed to Continental was based on the actual time worked by its drivers, Wolla Oilfield's management cross-checked and validated the hours its drivers worked, and that no invoice is processed with excessive time or time not worked. Furthermore,

Wolla Oilfield employees assured Continental it had not been overbilled, double-billed, or ghost billed (*i.e.*, billed for work that was not performed).

21. On October 31, 2019, Jason Wolla assured Continental's auditors "with 100% certainty" that Wolla Oilfield had never billed Continental for a job that Wolla had not done, and that every job Wolla had done had been for the agreed-upon pricing.

22. Wolla Oilfield and Jason Wolla's assurances were completely false. Continental's auditors confirmed the Whistleblower's account – Wolla Oilfield was engaged in a systematic effort to overbill Continental through fraudulent billing tactics, and consistently billed Continental for more hours than its employees actually worked.

23. The timesheets Wolla Oilfield's drivers submitted to Wolla Oilfield consistently showed drivers actually worked less than 10 hours a day on average, but that Wolla Oilfield billed Continental for significantly more. In fact, Wolla Oilfield employees would often bill Continental for *more than 24 hours of work in a day*. For example, one Wolla Oilfield employee billed Continental and other customers for 28 hours on August 5, 2019, and 29.5 hours on August 6, 2019, even though his actual timesheet shows he only worked 12 hours on each of those days (*see* Example Time Sheet, attached hereto as Exhibit 3).

24. Wolla Oilfield attempted to hide its pervasive over-billing practices by falsifying its documents and records. Since DOT regulations clearly state a commercial truck driver cannot work for more than 14 consecutive hours, customers would obviously be concerned if they were billed by a driver for more than 14 hours in a single day. Accordingly, to avoid detection of their scheme, Wolla Oilfield's management and

accounting personnel manipulated the driver's work tickets and customer invoices by moving the fraudulent hours to different days, so that the billings for any day would not exceed 14 hours.

25.     In addition to Wolla Oilfield fraudulently misstating the hours its employees worked and billing Continental for those inflated hours, Wolla Oilfield also excessively marked up the cost of propane (which is used in the hot oil service process), even though the parties agreed propane would be charged to Continental at cost as a pass-through item. These excessive mark-ups caused Continental to overpay Wolla Oilfield for propane by over $700,000 alone.

<u>Visual Surveillance</u>

26.     To confirm and validate the information learned from the Whistleblower and its audit, Continental installed cameras at various well sites Wolla Oilfield serviced. This surveillance demonstrated Wolla Oilfield billed Continental for time its drivers were not even at the well locations. The surveillance footage revealed Wolla Oilfield personnel spent, on average, 15 minutes at each Continental well, but billed for several hours of time. For example, Wolla Oilfield billed Continental for *six hours* of work on September 27, 2019 on the Corsican Federal 1-8 Well Pad, but onsite camera images showed Wolla Oilfield personnel only spent *one hour and nineteen minutes* at that location on that day.

27.     The visual surveillance also revealed Wolla Oilfield repeatedly "ghost billed" Continental – that is, billed Continental for work even though no Wolla Oilfield employees ever came to the Continental wells on those days. As described above, the

{S537361;}                                         7

fraudulent billings from certain days were moved to other days where no work occurred in order to prevent Continental from detecting Wolla Oilfield's excessive billing practices.

*   *   *

28. Based on the information obtained during Continental's audit, Wolla Oilfield has systematically overbilled Continental for years. As a direct and proximate result of Wolla Oilfield and Jason Wolla's wrongful conduct, Continental has been significantly overcharged by at least $2.4 million from 2017-2019.

29. Upon information and belief, Wolla Oilfield is currently under investigation by the FBI for its fraudulent practices.

### **COUNT I – CIVIL RICO, 18 U.S.C. § 1962(c)**

30. The allegations of paragraphs 1 through 29 are incorporated herein by reference.

31. Wolla Oilfield, Jason Wolla, Wolla Oilfield's drivers and other employees are an associated-in-fact enterprise, as that term is defined in 18 U.S.C. §1961(4) (the "Enterprise").

32. The Enterprise has functioned since 2016, as an ongoing organization with an identifiable structure and various associates that function as a continuing unit to facilitate the Enterprise's purpose. In particular:

    a. Jason Wolla established, owns, and manages Wolla Oilfield, and has directed the activities of Wolla Oilfield employees.

    b. Wolla Oilfield employees are hired by Jason Wolla and employed by Wolla Oilfield in order to perform the hot oil service and prepare work tickets and invoices

to send to Wolla Oilfield's customers.  Wolla Oilfield employees were paid based on the number of hours they billed to Wolla Oilfield's customers.

   c.  Wolla Oilfield contracts with oil producers and sends these customers invoices, which Wolla Oilfield's customers (such as Continental) pay.

  33.  The Enterprise exists separate and apart from the racketeering activity discussed below.  Since 2016, the Enterprise has provided a hot oil service to various oil producers who operate wells in North Dakota.  The Enterprise's activities also affect interstate commerce.  For example, Wolla Oilfield does business with Continental, which is a corporation domiciled in Oklahoma.

  34.  Wolla Oilfield participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Continental and Wolla Oilfield's other customers.

  35.  Specifically, since 2017 until the present, Wolla Oilfield sent Continental fraudulent invoices on a bi-weekly basis.  These invoices were fraudulent because they either vastly overstated the amount of work Wolla Oilfield's employees performed for Continental, or charged Continental for work Wolla Oilfield's employees did not in fact perform.  The purpose of this fraudulent scheme was to defraud Continental and obtain payments that it was not entitled to receive under the parties' MSC.

  36.  Pursuant to and in furtherance of their fraudulent scheme, Wolla Oilfield committed multiple related acts of wire fraud by sending these fraudulent invoices from Wolla Oilfield's offices in North Dakota to Continental in Oklahoma via interstate wire

using OpenInvoice, an online system invoicing system. Wolla engaged in this activity repeatedly since at least 2017, including, but not limited to:

      a.      On September 27, 2019, Wolla billed Continental for six hours of work that its employee allegedly performed at the Corsican Federal 1-8 Well Pad. However, Continental's visual surveillance showed the Wolla employee was on location for only one hour and nineteen minutes that day.

      b.      On September 28, 2019, Wolla billed Continental for work that its employee allegedly performed at the Salo 2-35H and Hamlet 3-2H wells. However, Continental's visual surveillance showed that no Wolla employee was present at those locations on that day.

      c.      On October 3, 2019, Wolla Oilfield sent Continental five invoices and billed Continental for 5 hours of work its employees allegedly performed at the Rath Federal 6-22H1, 7-22H, 8-22H2, 9-22H, and 12-22H2 wells on September 26, 2019. However, Continental's visual surveillance showed no Wolla employee came to those locations on that day.

      d.      On October 3, 2019, Wolla Oilfield sent Continental two invoices and billed Continental for two hours of work its employees allegedly performed at the Hamlet 3-2H and Salo 2-35H wells on September 28, 2019. However, Continental's visual surveillance showed no Wolla employee came to those locations on that day.

      e.      On October 16, 2019, Wolla Oilfield sent Continental two invoices and billed Continental for two hours of work its employees allegedly performed at the

Corsican Federal 1-15H and 2-15H1 wells on October 2, 2019. However, Continental's visual surveillance showed no Wolla employee came to those locations on that day.

    f.  On October 17, 2019, Wolla Oilfield sent Continental three invoices for three hours of work its employees allegedly performed at the Rath Federal 6-22H1, 8-22H2, and 12-22H2 wells on October 9, 2019. However, Continental's visual surveillance showed no Wolla employee came to those locations on that day.

    g.  On October 17, 2019, Wolla Oilfield sent Continental two invoices for two hours of work its employees allegedly performed at the Salo 2-35H and 3-35H wells on October 10, 2019. However, Continental's visual surveillance showed no Wolla employee came to those locations on that day.

    h.  On October 17, 2019, Wolla billed Continental for an hour of work its employee allegedly performed at the Rath Federal 7-22H and Rath Federal 9-22H wells on October 1, 2019. However, Continental's visual surveillance showed the Wolla employee was on location for only eighteen minutes that day.

  37.  Wolla Oilfield's fraudulent conduct is not limited to the instances noted above. Wolla Oilfield's records indicate a pervasive practice of billing customers for more hours than its employees actually worked, failing to institute internal controls to eliminate these practices, and manipulating records to hide these practices. Wolla Oilfield's fraudulent conduct harmed Continental by causing it to overpay for the services it was receiving.

  38.  Wolla Oilfield engaged in this conduct with an intent to defraud Continental and Wolla's other customers. For example, by training its drivers to manipulate their time

entries, failing to institute internal controls, and directing its accounting employees to adjust records and invoices sent to customers to avoid anyone from detecting what would be clear violations of federal regulations, Wolla Oilfield attempted to conceal its fraudulent billing practices and continue to defraud its customers.

39. The whistleblower's account, Continental's audit of Wolla's records, and even Jason Wolla's statements during Continental's audit demonstrated the unlawful and fraudulent conduct noted above is not isolated, but rather has been Wolla Oilfield's regular way of doing business for several years and constitutes a pattern of racketeering activity, which is likely to recur in the future.

40. As a direct and proximate result of Wolla Oilfield's fraudulent billing activity and other unlawful conduct, Continental suffered significant monetary damages to be proven at trial, but which Continental currently estimates exceed $2.4 million.

## COUNT II – CIVIL RICO CONSPIRACY, 18 U.S.C. § 1962(d)

41. The allegations of paragraphs 1 through 40 are incorporated herein by reference.

42. Jason Wolla knew about and agreed to facilitate the commission of the acts constituting a pattern of racketeering activity discussed above. This agreement and facilitation is shown by, among other things, instructing Wolla Oilfield employees on how to manipulate hours in records for customer billing and payroll purposes, and managing Wolla Oilfield as it distributed its fraudulent invoices using interstate wires.

43. Jason Wolla participated in the Enterprise, which affected interstate commerce by targeting oil producers, such as Continental.

44. As a direct and proximate result of Jason Wolla's unlawful conduct, Continental suffered damages to be proven at trial, but which Continental currently estimates exceed $2.4 million.

## **COUNT III – BREACH OF CONTRACT**

45. The allegation of paragraphs 1 through 44 are incorporated herein by reference.

46. Wolla Oilfield and Continental entered into the MSC on April 4, 2016.

47. The MSC is a valid and enforceable contract.

48. Under Section 15.1 of the MSC, Wolla Oilfield agreed to conduct its operations in accordance with all applicable laws, rules, regulation and decrees of any governmental or regulatory body having jurisdiction over it. Among other things, Wolla Oilfield is required to comply with the Federal Motor Carrier Safety Regulations, which prohibit drivers from driving for more than 14 consecutive hours after coming on duty.

49. Under Section 15.1 of the MSC, Wolla Oilfield agreed all invoices, financial settlements, billings and reports rendered to Continental shall reflect properly the facts about all activities and transactions handled for the account of Continental and those documents may be relied upon as being complete and accurate.

50. Under Section 15.1 of the MSC, Wolla Oilfield agreed to promptly notify Continental upon discovery of any instance where Wolla failed to comply with the provisions of Section 15.1.

51. Wolla Oilfield breached the MSC by, among other things, submitting fraudulent invoices to Continental. These invoices vastly overstated the amount of hours

Wolla Oilfield employees performed services for Continental, and the cost of materials used in performing those services. Wolla Oilfield engaged in a number of fraudulent practices to prevent Continental from detecting its wrongful conduct and these breaches, including but not limited to manipulating invoices and work tickets.

52. As a direct result of these breaches, Continental suffered significant damages to be proven at trial, but which Continental currently estimates exceed $2.4 million.

## COUNT IV – OKLAHOMA CONSUMER PROTECTION ACT, 15 O.S. § 751 et. seq.

53. The allegations of paragraphs 1 through 52 are incorporated herein by reference.

54. Wolla Oilfield engaged in a number of unlawful practices under the Oklahoma Consumer Protection Act, 15 O.S. § 751 et. seq., including but not limited to:

    a. making false and misleading statements of fact concerning the price of its services, *see* 15 O.S. § 753(11);

    b. knowingly causing charges to be made to Continental through OpenInvoice that were not authorized by Continental, *see* 15 O.S. § 753(25); and

    c. engaging in deceptive trade practices, specifically misrepresenting the amount of time it provided services to Continental on its invoices, which deceived Continental to Continental's detriment, *see* 15 O.S. § 753(20).

55. Wolla Oilfield engaged in these unlawful practices in the course of its business.

56. Wolla Oilfield's unlawful practices caused Continental injury by deceiving Continental into overpaying Wolla Oilfield for the services it provided.

57. As a direct and proximate result of Wolla Oilfield's unlawful practices, Continental as a consumer suffered actual damages (*i.e.*, injury-in-fact) to be proven at trial, but which Continental currently estimates exceed $2.4 million.

## **PRAYER FOR RELIEF**

58. WHEREFORE, Continental requests that this Court enter judgment against Wolla Oilfield and Jason Wolla as follows:

   a. That Wolla Oilfield has breached the MSC, violated the Oklahoma Consumer Protection Act, and RICO;

   b. That Jason Wolla has violated RICO;

   c. That Wolla Oilfield and Jason Wolla are liable to Continental for actual damages for their violations of law;

   d. That Wolla Oilfield and Jason Wolla are liable for treble damages for its violations of RICO;

   e. That Wolla Oilfield and Jason Wolla are liable for costs and attorneys' fees for its violations of the Oklahoma Consumer Protection Act and RICO;

   f. That Wolla Oilfield and Jason Wolla are liable for pre-judgment and post-judgment interest and costs on all sums awarded;

   g. Any such other and further relief as the Court may deem just and proper under the circumstances.

DATED:  March 4, 2020

        Respectfully submitted,

        */s/Nicholas "Nick" V. Merkley*
        Nicholas ("Nick") V. Merkley, OBA No. 20284
        GableGotwals
        One Leadership Square 15th Floor
        211 N. Robinson
        Oklahoma City, OK 73102
        Telephone:  405.568.3311
        Email:  nmerkley@gablelaw.com

        AND

        Hugh Q. Gottschalk (*pro hac vice forthcoming*)
        Pawan Nelson (*pro hac vice forthcoming*)
        Wheeler Trigg O'Donnell LLP
        370 Seventeenth Street, Suite 4500
        Denver, CO  80202
        Telephone:  303.244.1800
        Facsimile:  303.244.1879
        Email:      gottschalk@wtotrial.com
                       pnelson@wtotrial.com

**DEMAND FOR JURY TRIAL**