# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

CONTINENTAL RESOURCES, INC., )
)
        Plaintiff, )
)
v. )     Case No. 20-cv-00200-PRW
)
WOLLA OILFIELD SERVICES LLC, )
)
        Defendant. )

## ORDER

Before the Court is Defendant's "Motion to Dismiss Plaintiff's Second Amended Complaint" (Dkt. 28) (the "Motion to Dismiss"). For the reasons set forth below, the Court **DENIES** Defendant's Motion to Dismiss.

### *Background*

When pumping oil and gas, solids can build up in the pipes, constricting or blocking the flow. Hot oil service providers prevent and clear this buildup by circulating heated fluid in the equipment. This dispute is between an oil and gas producer and a hot oil service provider: Plaintiff, Continental Resources, Inc. ("Continental"), is the oil and gas producer and Defendant, Wolla Oilfield Services LLC ("Wolla"), is the hot oil service provider.

According to Continental's Second Amended Complaint (Dkt. 25)—and bearing in mind that Wolla contests Continental's version of events—Continental and Wolla entered into an agreement (the "Master Service Contract") under which Wolla would provide hot oil services at any hourly rate for Continental's North Dakota wells. As part of that contract,

Wolla agreed to submit its invoices through an online billing system, to comply with applicable law, and to bill accurately and comprehensively for the work it performed.

Continental alleges that a whistleblower in Wolla's accounting department contacted it to report systematic overbilling in connection with this arrangement. Wolla's upper management, the whistleblower explained, was training and incentivizing its hot oil truck drivers to secretly overbill customers, including Continental.

Continental conducted an audit to investigate. In the course of that audit, Wolla repeatedly assured Continental that its bills were accurate. Continental concluded otherwise. It found that Wolla employees were overbilling it for time worked, including billing it for more than twenty-four hours of work in a single day by a single employee. It also found that Wolla employees were shifting hours worked from one day to another to give the appearance of compliance with a Department of Transportation regulation limiting drivers to fourteen-hour workdays. Continental also determined that Wolla was overcharging it for propane, which, it alleges, was to be billed at cost. In total, Continental calculated overbilling of at least $2,400,000.00.

Continental confirmed these suspicions with video surveillance. It even discovered several instances of "ghost billing"—billing for time when no worker was present at any point in the day.

On March 4, 2020, Continental sued Wolla in this Court. Continental filed its Second Amended Complaint (Dkt. 25) on August 25, 2020. In the Second Amended Complaint, Continental asserts claims for breach of contract, actual fraud, constructive fraud, and unjust enrichment, as well as a claim under the Oklahoma Consumer Protection

Act. Wolla subsequently filed its "Motion to Dismiss Plaintiff's Second Amended Complaint" (Dkt. 28) pursuant to Federal Rule of Civil Procedure 12(b)(6), asking the Court to dismiss each of these claims.

### *Standard of Review*

In reviewing a Rule 12(b)(6) motion to dismiss, all well-pleaded allegations in the complaint must be accepted as true and viewed "in the light most favorable to the plaintiff."[1] While a complaint need not recite "detailed factual allegations," "a plaintiff's obligation to provide the grounds of [her] entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."[2] The pleaded facts must establish that the claim is plausible.[3]

Fraud-based claims must also satisfy Rule 9(b)'s heightened pleading standard, which requires "a party [to] state with particularity the circumstances constituting fraud."[4]

### *Discussion*

### 1. *The Breach of Contract Claim*

Wolla first argues that the breach of contract claim should be dismissed because the Master Service Contract does not obligate it to perform any work.[5] Rather, the Master

---

[1] *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (quoting *David v. City & County of Denver,* 101 F.3d 1344, 1352 (10th Cir. 1996)).

[2] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citations omitted) (alteration in original).

[3] *Id.*

[4] Fed. R. Civ. P. 9(b).

[5] *See* Def.'s Mot. to Dismiss (Dkt. 28) at 10 ("While the MSC generally governs the parties' relationship, the MSC itself does not obligate Wolla to perform any specific services.").

Service Contract merely provides a framework for future agreements to provide hot oil services,[6] which are to be separately agreed to at a later date in the form of a "Scope of Work."[7] And because Continental identifies no such "Scope of Work,"[8] it can allege no breach. As for Continental's allegations that Wolla agreed to charge it at "an hourly rate for the hot oil services" and "at cost as a pass-through item" for propane, Wolla simply responds that these allegations are conclusory and therefore insufficient.

The Court does not agree with Wolla's argument that Continental must identify a "Scope of Work" in order to allege a breach. Specifics are not needed at this juncture.[9] It is enough at this early stage that Continental plausibly alleges a contract, a breach of that contract, and damages,[10] and Continental has done just that. It alleges that it entered into an agreement with Wolla in contemplation of future hot oil services; that the provision of those hot oil services was subject to various conditions; that the hot oil services were rendered; that the conditions were not met; and that the failure to satisfy those conditions resulted in damages.

---

[6] *See id.* ("Instead, MSC Section 1.1 provides that specific services will, from time to time, be agreed to as 'Scopes of Work' . . . .").

[7] *See id.*

[8] *See id.* at 11 ("Continental attached a copy of the MSC to its Second Amended Complaint but makes no allegations regarding any Scope of Work executed pursuant to the terms of the MSC." (citation omitted)).

[9] *See Twombly*, 550 U.S. at 555 (stating that a complaint need not recite "detailed factual allegations").

[10] *Digital Design Grp., Inc. v. Info. Builders, Inc.*, 2001 OK 21, ¶ 33, 24 P.3d 834, 843 (The elements of a breach of contract claim are: "1) formation of a contract; 2) breach of the contract; and 3) damages as a direct result of the breach." (footnote omitted)).

Even if Continental needed to allege a "Scope of Work," such an agreement can be inferred from the facts that are alleged. Continental alleges that it entered into the Master Service Contract with Wolla in contemplation of future hot oil services and that Wolla subsequently rendered those services. By Wolla's own account, those services would only have been rendered if Continental and Wolla agreed to a "Scope of Work." As such, it can be inferred that a "Scope of Work" exists.

Wolla's argument that Continental's allegations pertaining to the agreement to bill at "an hourly rate for the hot oil services" and "at cost as a pass-through item" for propane are conclusory and therefore insufficient is also unpersuasive. These allegations are not conclusory: they are specific, factual, cohere with the other factual allegations, and, as a result, are more than enough to state a claim.

### 2. *The Claim Under the Oklahoma Consumer Protection Act*

Next, Wolla makes three arguments that Continental's claim under the Oklahoma Consumer Protection Act (the "OCPA")[11] fails as a matter of law. First, it argues that the OCPA does not cover service contracts, like the Master Service Contract. Second, for related reasons, it posits that the OCPA is inapplicable because Continental is not a "consumer," as defined by and necessary under the statute. Finally, it argues that the OCPA does not apply because the alleged prohibited acts occurred in North Dakota, not in Oklahoma. The Court addresses these contentions in turn.

---

[11] Okla. Stat. tit. 15, § 751 et seq.

*a. The Oklahoma Consumer Protection Act Applies to Services.*

As to this first argument, the Court concludes that the OCPA does not exclude service contracts. Wolla draws on the following language from an Oklahoma Supreme Court case to argue that only the end users of goods—and not the end users of services—can be "consumers" for purposes of the OCPA: "the plain and ordinary meaning of 'consumer'" is "one who consumes or uses economic goods."[12] This interpretation collapses upon consideration of the definition of "economic good," the balance of the quoted case, the text of the Oklahoma Consumer Protection Act, and an earlier decision of the Oklahoma Supreme Court.

First, the definition of an "economic good" explicitly includes services: an economic good is "a product **or service** which can command a price when sold."[13]

Second, language elsewhere in the quoted case (*Lumber 2, Inc. v. Illinois Tool Works, Inc.*)[14] confirms that consumers of services *are* protected by the Oklahoma Consumer Protection Act. In defining "consumer" in *Lumber 2*, the Oklahoma Supreme Court resorted to the "plain and ordinary meaning" of the term.[15] It quoted three dictionary definitions of "consumer" to that end.[16] The first of these, as discussed above, uses the term

---

[12] Def.'s Mot. to Dismiss (Dkt. 28) at 17 (quoting *Lumber 2, Inc. v. Illinois Tool Works, Inc.*, 2011 OK 74, ¶ 20, 261 P.3d 1143, 1149).

[13] *Economic Good*, *Oxford Dictionary of English* (3rd ed. 2010).

[14] *Lumber 2, Inc. v. Illinois Tool Works, Inc.*, 2011 OK 74, 261 P.3d 1143.

[15] *Id.* ¶ 15, 261 P.3d at 1147 (stating that the lower court had "correctly considered the plain and ordinary meaning of the term 'consumer' which we are required to do with an undefined statutory term").

[16] *See id.*

"economic good," which is understood to include services. And the remaining two expressly include services:

> consumer. A person who buys goods **or services** for personal, family, or household use, with no intention of resale; a natural person who uses products for personal rather than business purposes. *Black's Law Dictionary, Ninth Edition* (2009).

> consumer—1. One that consumes. 2. *Economics*. One who acquires goods **or services**; a buyer. *The American Heritage Dictionary of the English Language, New College Edition* (1980).[17]

Third, the plain text of the Oklahoma Consumer Protection Act clearly contemplates application to services. For example, Okla. Stat. tit. 15, § 753(8), read in conjunction with the definition set forth in Okla. Stat. tit. 15, § 752(2), prohibits advertising "any service" with intent not to sell it as advertised. Likewise, Okla. Stat. tit. 15, § 753(15) prohibits "[f]alsely stat[ing], knowingly or with reason to know, that services, replacements, or repairs are needed." To categorically exclude services despite this language would render a wide swath of the statute nugatory, flying in the face of the well-established interpretive canon requiring courts to give effect to every word of a statute if possible.[18]

Finally, the Oklahoma Supreme Court has tacitly acknowledged the applicability of the OCPA to the service-contract context: in *Patterson v. Beall*, the Oklahoma Supreme

---

[17] *Id.* (emphasis added).

[18] *See Hamilton v. Northfield Ins. Co.*, 2020 OK 28, ¶ 9, 473 P.3d 22, 26 ("A statute will be given a construction, if possible, which renders every word operative, rather than one which makes some words idle and meaningless. This interpretive principle applies to every word, phrase, and clause of the statute. Moreover, when construing a statute, relevant provisions must be considered together, where possible, to give force and effect to each." (cleaned up)).

Court stated that it would "have no difficulty concluding" that a demand for payment for a real estate appraisal (i.e., a service) that was neither requested nor performed "constituted an unfair trade practice as that phrase is defined in the OCPA."[19]

For these reasons, the Court finds that the Oklahoma Consumer Protection Act covers services.[20]

> b. *Continental is a "Consumer" for Purposes of the Oklahoma Consumer Protection Act.*

The Court also finds that Continental is a "consumer" with respect to the transaction at issue. The OCPA confers a private cause of action upon "aggrieved consumers."[21] While the OCPA does not define "consumers," the Oklahoma Supreme Court has since given that term content. In *Lumber 2, Inc. v. Illinois Tool Works, Inc.*, the Oklahoma Supreme Court,

---

[19] 2000 OK 92, ¶ 35, 19 P.3d 839, 847.

[20] In *Sooner Hot Oil & Well Servs., LLC v. Bison Clean Fuels, LLC*, a different judge disagreed, finding that "the Oklahoma Supreme Court has interpreted the [Oklahoma Consumer Protection] Act to exclude those contracts which are 'nothing more than service contracts.'" No. CIV-14-0479-HE, 2014 WL 6455521, at *1 (W.D. Okla. Nov. 13, 2014) (quoting *James v. Tyson Foods, Inc.*, 2012 OK 21, ¶ 29, 292 P.3d 10, 18). He quoted *James v. Tyson Foods, Inc.*, 2012 OK 21, 292 P.3d 10, in support. In *Tyson Foods*, the plaintiffs raised chickens owned by Tyson Foods, Inc., the defendant, ("Tyson") on behalf of, and with feed provided by, Tyson. Tyson argued that because "the growers *purchased* no goods or services," they "[were] not 'consumers'" and therefore "[could not] seek the protection of the [Oklahoma] Consumer Protection Act." *Id.* ¶ 24 (emphasis added). The Oklahoma Supreme Court "agree[d] with Tyson's analysis of the law." *Id.* In other words, the plaintiffs in *Tyson* were not "consumers" for purposes of the OCPA because they only *provided* a service. As discussed below, to be a "consumer" for purposes of the OCPA, a person must be the *end user* of the goods or service in the transaction at issue. *See supra* Section 2(b).

[21] Okla. Stat. tit. 15, § 761.1(A) ("The commission of any act or practice declared to be a violation of the Consumer Protection Act shall render the violator liable to the aggrieved consumer . . . .").

citing several dictionary definitions of "consumer" and "consume," found that whether a person is a "consumer" depends on their relation to a particular good or service.[22] If that person is the end user of the good or service at issue, then that person is a "consumer" with respect to that particular transaction.[23]

In this case, Continental procured the hot oil services at issue as part of its production of gas and oil. In these circumstances, with a producer using a service as part of its production process, the question of whether the producer is a "consumer" of that service could be close: there is some argument to be made that when a producer uses a service as part of its production process, the end consumer of the product is also the end user of the service that went into making it. But this situation is far from a direct resale of services.[24] Moreover, the Oklahoma Consumer Protection Act "is to be liberally construed to effectuate its underlying purpose"[25] and to read the OCPA's definition of "consumer" so narrowly would effectively cut all businesses from its protection—despite a clear statutory intent to do no such thing[26]—as most (if not all) acquisitions of goods and services

---

[22] *See* 2011 OK 74, ¶ 21, 261 P.3d 1143, 1149 ("Our holding does not mean that Lumber 2, as a corporate entity, could never be a consumer under different facts. However, the purchase would have to involve goods which Lumber 2 bought to use in its own business, not to resell to its customers.").

[23] *See id.* ¶¶ 15, 20–21, 261 P.3d at 1147, 1149 ("[U]nder the plain and ordinary meaning of 'consumer,' i.e., one who consumes or uses economic goods . . . .").

[24] *See supra* n.22; *cf. Lumber 2*, 2011 OK 74, 261 P.3d 1143 (holding that a retailer and purchaser of merchandise intended for resale in its business is not a "consumer" for purposes of the Oklahoma Consumer Protection Act).

[25] *Patterson v. Beall*, 2000 OK 92, ¶ 28, 19 P.3d 839, 846 (citation omitted).

[26] When the Oklahoma Consumer Protection Act was enacted in 1972, "consumer transaction," as used therein, was limited to "personal, household and family purposes."

by businesses are aimed, in some roundabout way, at sales to customers. For these reasons, the Court finds that Continental was the end user of the hot oil services and was therefore a "consumer" for purposes of the OCPA.

### c. The Court Will Certify the Question of the Extraterritorial Application of the Oklahoma Consumer Protection Act to the Oklahoma Supreme Court.

Wolla's last argument—that the OCPA is inapplicable because the alleged prohibited acts occurred outside of Oklahoma—presents a difficult question. Unlike many other states,[27] Oklahoma did not expressly limit its consumer protection statute to acts occurring within the state. And unlike other states with consumer protection statutes lacking such limiting language,[28] the Oklahoma Supreme Court has not adopted a

---

*See* 15 O.S. Supp.1972 § 752(A). In 1980, "business oriented" purpose was added to the definition of "consumer transaction" and "family" purpose was deleted. *Compare* 15 O.S. Supp.1980 § 752(B) *with* 15 O.S. Supp.1972 § 752(A). The Oklahoma Supreme Court has held that with this addition, "the Legislature intended to provide the same level of protection to corporations and other legal entities purchasing goods for business use which was already enjoyed by individuals purchasing goods for personal or household use." *Lumber 2, Inc. v. Illinois Tool Works, Inc.*, 2011 OK 74, ¶ 12, 261 P.3d 1143, 1146.

[27] *See, e.g.*, Ohio Rev. Code Ann. § 1345.04 ("The courts of common pleas, and municipal or county courts within their respective monetary jurisdiction, have jurisdiction over any supplier with respect to any act or practice **in this state** covered by sections 1345.01 to 1345.13 of the Revised Code, or with respect to any claim arising from a consumer transaction subject to such sections." (emphasis added)); S.C. Code Ann. § 56-15-45 ("Except as may be provided otherwise in subsections (A) and (B) of this section, a manufacturer or franchisor may not sell, directly or indirectly, a motor vehicle to a consumer **in this State**, except through a new motor vehicle dealer holding a franchise for the line make that includes the motor vehicle." (emphasis added)); N.Y. Gen. Bus. Law § 349 ("Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service **in this state** are hereby declared unlawful." (emphasis added)).

[28] *See, e.g.*, *Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*, 492 F.3d 484, 489 (4th Cir. 2007) ("South Carolina rules of construction provide that statutes must not be read to operate outside the state's borders."); *Cruz v. Lawson Software, Inc.*, 2009 WL

presumption against extraterritorial application. The result, then, is a consumer protection statute that is not limited to prohibited acts occurring within the state on its face and with no applicable interpretative doctrine adopted by the highest court of the state with such an effect. This, as Wolla points out, presents the potentially serious constitutional problem of extraterritorial state legislation. As the Fourth Circuit explained the problem:

> The principle that state laws may not generally operate extraterritorially is one of constitutional magnitude. One state may not project its legislation into another, as the Commerce Clause precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State.[29]

But, Continental responds, that potential constitutional issue is of no concern because, in its view, the alleged prohibited acts—the submissions of the fraudulent invoices—occurred in Oklahoma, where it received the invoices. However, Wolla ostensibly submitted its invoices to an online portal while in North Dakota. The fraudulent representation, then, was made in North Dakota, not Oklahoma. And even if, as Continental suggests, the mere act of accessing an online portal to view a fraudulent invoice submitted elsewhere was sufficient to establish that the prohibited act occurred in Oklahoma for purposes of the Oklahoma Consumer Protection Act, the reach of the statute would still raise a serious constitutional question.

---

10711629, at *5 (D. Minn. May 21, 2009) ("There is a general presumption that Minnesota statutes do not apply extraterritorially." (citing *In re Pratt*, 18 N.W.2d 147, 153 (Minn. 1945)).

[29] *Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*, 492 F.3d 484, 489–90 (4th Cir. 2007) (cleaned up).

Before this Court passes on the constitutionality of the Oklahoma Consumer Protection Act, however, a state court needs to define the scope of the statute. The Court therefore sua sponte[30] certifies this question to the Oklahoma Supreme Court in accordance with Okla. Stat. tit. 20, § 1602 so that it may answer this novel and dispositive question of state law implicating the constitutionality of a state statute.[31]

### 3. The Claims for Actual and Constructive Fraud

#### a. Continental's Fraud and Breach of Contract Claims are Distinct.

Next, Wolla argues that Continental's actual and constructive fraud claims fail as a matter of law because these claims are indistinct from its breach of contract claim.

It may be correct on the law: the consensus view among the federal district courts is that under Oklahoma law, a plaintiff cannot simultaneously pursue fraud and breach of contract claims when those claims are based on the same facts and seek the same damages.[32]

But there is a slight-but-significant difference in the factual allegations supporting the breach of contract and fraud claims in this case. The breach of contract claim turns, in

---

[30] *Kansas Jud. Rev. v. Stout*, 519 F.3d 1107, 1120 (10th Cir. 2008), *certified question answered*, 287 Kan. 450, 196 P.3d 1162 (2008), *opinion after certified question answered*, 562 F.3d 1240 (10th Cir. 2009) ("[A] federal court may certify a state-law issue sua sponte." (citing *Elkins v. Moreno*, 435 U.S. 647, 662, 98 S.Ct. 1338, 55 L.Ed.2d 614 (1978))).

[31] *See id.* at 1119.

[32] *See, e.g.*, *Key v. Exxon Mobil Corp.*, 2020 WL 7344701, at *9 (E.D. Okla. Dec. 14, 2020); *McKnight v. Marathon Oil Co.*, 2017 WL 1628981, at *2 (W.D. Okla. May 1, 2017); *Simonsen v. McClinton Energy Grp., LLC*, 2014 WL 5795494, at *6–7 (N.D. Okla. Nov. 6, 2014).

relevant part, on the allegation that Wolla inaccurately billed for the work it performed. The fraud claims, in contrast, turn on the allegation that Wolla *deliberately misrepresented* the extent and nature of the work it performed. The difference is germane because the latter allegation, if proven, goes beyond a breach of contract into tort and, consequently, may support the award of punitive damages sought.[33] The fraud and breach of contract claims are therefore distinct and can proceed in tandem.

      *b. Continental's Allegations of Actual Fraud Satisfy the Heightened Pleading Standard Under Federal Rule of Civil Procedure 9(b).*

Wolla also argues that Continental's allegations supporting its actual fraud claim do not satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b). It argues, specifically, that to satisfy this heightened pleading standard, Continental must identify fraudulent invoices for the entire three-year period of alleged fraudulent activity, including who sent the fraudulent invoices, who received them, and when. The Court disagrees.

Federal Rule of Civil Procedure 9(b) requires plaintiffs "alleging fraud . . . [to] state with particularity the circumstances constituting fraud . . . ."[34] At a minimum, this means a plaintiff must set forth the "who, what, when, where, and how" of the alleged fraud.[35] The principal aims of this particularity requirement are to protect defendants' reputations

---

[33] Second Am. Compl. (Dkt. 25) ¶ 62(c) (asserting that Wolla is liable for punitive damages).

[34] Fed. R. Civ. P. 9(b).

[35] *See United States ex rel. Schwartz v. Coastal Healthcare Grp., Inc.*, 232 F.3d 902, 2000 WL 1595976, at *3 (10th Cir. 2000) (citations omitted) (unpublished table decision).

from the harm attendant to general, unsubstantiated accusations of fraud or dishonest conduct,[36] to put defendants on notice of the allegedly fraudulent conduct so that they can formulate a defense,[37] and to prevent plaintiffs from tagging on specious fraud claims to their pleadings in an attempt "to induce advantageous settlements or for other ulterior purposes."[38]

Continental alleges in great detail the "who, what, when, where, and how" of the alleged fraud. It alleges that, in the course of a nearly three-year business relationship, "Jason Wolla directed employees not to put contemporaneous time stamps on work tickets or use GPS trackers so as not to draw attention to their business and billing practices" and that he "also directed Wolla Oilfield's accounting department to inflate the hours accounting department employees assigned to certain employees."[39] It cites a whistleblower and bolsters its allegations with numerous examples drawn from a corroborating audit and video surveillance. Moreover, the great detail of these allegations is sufficient to assuage any concerns of unjust reputational harm and strategic disadvantage, and to require anything more would be akin to requiring proof at pleading.

---

[36] *See United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 921 (4th Cir. 2003) ("Rule 9(b) protects defendants from harm to their goodwill and reputation." (internal quotation marks omitted)); *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992) ("[The particularity requirement] stems from the obvious concerns that general, unsubstantiated charges of fraud can do damage to defendant's reputation.").

[37] *See Westinghouse Savannah River Co.*, 352 F.3d at 921.

[38] *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992).

[39] Second Am. Compl. (Dkt. 25) ¶ 15.

The two cases cited by Wolla are distinguishable. Unlike *U.S. ex rel. Dillahunty v. Chromalloy Oklahoma*, where the plaintiff failed to "even allege the submission of any actual claims,"[40] Continental alleges biweekly submissions by Wolla over a nearly three-year period, even going so far as to lay out the fraudulent aspects of some specific invoices. And unlike *U.S. ex rel. Lacy v. New Horizons, Inc.*, this case does not deal with a claim brought under the False Claims Act, which, in Judge Heaton's view, necessitates a unique degree of specificity in pleading "because, among other things, [such specificity] is necessary to the resolution of other issues which arise in [False Claims Act] cases . . . ."[41]

The Court is therefore satisfied that Continental has adequately pleaded its fraud claims.

> c. *Continental Adequately Alleges a Material Misrepresentation and Detrimental Reliance.*

Wolla argues, further, that Continental fails to allege a material misrepresentation and detrimental reliance, as is necessary to state claims for actual and constructive fraud. These arguments, in all their asserted forms, are not persuasive.

With respect to its actual fraud claim, Continental alleges in considerable detail that Wolla represented that it did work that it did not, in fact, do. With respect to its constructive fraud claim, Continental alleges that Wolla represented that it would bill on a per-hour basis but frequently billed on a per-well basis instead. These are material

---

[40] 2009 WL 3837294, at *4 (W.D. Okla. Nov. 16, 2009).

[41] 2008 WL 4415648, at *3 n.5 (W.D. Okla. Sept. 25, 2008), *aff'd*, 348 F. App'x 421 (10th Cir. 2009).

misrepresentations for the obvious reason that people do not willfully pay for services not performed or for services differing from those sought and agreed to.

Continental also alleges that it paid Wolla based on these representations.[42] If that is true, then Continental relied on these material misrepresentations to its detriment.

The Court finds, additionally, that these allegations are sufficiently particular for purposes of Federal Rules of Civil Procedure 8 and 9(b) for reasons analogous to those discussed above.[43]

>    d. *Continental Adequately Alleges that Wolla Owed it a Duty of Full Disclosure.*

Finally, Wolla asserts that Continental fails to allege that Wolla owed it a duty of full disclosure, as is required to state a claim for constructive fraud. In its view, to adequately allege such a duty, Continental must allege "what the partial disclosure was, what invoices contain such partial disclosure, [and] how such partial disclosure was misleading."[44] The Court agrees that Continental must allege these things to state a claim for constructive fraud in this case but disagrees as to the level of granularity required.

To state a claim for constructive fraud, a plaintiff must, indeed, allege that the defendant owed it a duty of full disclosure.[45] Such a duty may arise "once a defendant

---

[42] *See* Second Am. Compl. (Dkt. 25) ¶ 48 ("Continental relied on these false material misrepresentations and paid Wolla Oilfield's invoices to Continental's detriment.").

[43] *See supra* Section 3(b).

[44] Def.'s Mot. to Dismiss (Dkt. 28) at 29.

[45] *See Specialty Beverages, L.L.C. v. Pabst Brewing Co.*, 537 F.3d 1165, 1180 (10th Cir. 2008) (quoting *Lillard v. Stockton*, 267 F.Supp.2d 1081, 1113 (N.D. Okla. 2003)) (applying Oklahoma law).

voluntarily chooses to speak to plaintiff about a particular subject matter"[46] and doing so amounts to a selective disclosure of facts creating a false impression.[47]

The Court finds that Continental has alleged that Wolla owed it a duty of full disclosure. Continental alleges that Wolla represented that it would bill by the hour and then sent it invoices for work performed. But, Continental continues, some of these invoices reflected, unbeknownst to it, per-well billing instead of per-hour billing. In light of Wolla's earlier representation that it would bill by the hour, the selective disclosure of work "performed" without the qualification that it was billed on a per-well basis would predictably create the false impression that the invoices reflected per-hour billing. As such, Continental has, at a minimum, the rudiments of an allegation that Wolla owed it a duty of full disclosure.

The question that remains, then, is whether Continental has pleaded enough factual content to that end. It has. Continental provides detailed allegations of the "who, what, when, where, and how" of the constructive fraud: it points to Wolla and Jason Wolla (i.e., who) billing for hot oil services for Continental's North Dakota wells (i.e., where) when no Wolla worker was present at any point in the day (i.e., what) over the three-year period in which Wolla billed Continental for hot oil services (i.e., when) despite representing that

---

[46] *Id.* (quoting *Lillard v. Stockton*, 267 F.Supp.2d 1081, 1113 (N.D. Okla. 2003)) (applying Oklahoma law).

[47] *See id.* at 1181 (citing *Uptegraft v. Dome Petroleum Corp.*, 764 P.2d 1350, 1353 (Okla. 1988) ("The duty to speak arose when the defendant began negotiations; on disclosing in part the pertinent facts, such duty would be breached by withholding other pertinent facts. A duty to speak may arise from partial disclosure, the speaker being under a duty to say nothing or to tell the whole truth.")).

it would bill by the hour (i.e., how). This is enough to satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b). As before, to require more would be tantamount to requiring proof at pleading.

### 4. The Claim for Unjust Enrichment

A claim for unjust enrichment requires an enrichment of another and a resulting injustice.[48] Wolla argues that Continental fails to state a claim for unjust enrichment because "Continental has not set forth facts alleging a resulting injustice—i.e., that Wolla received payments from Continental in excess of the reasonable value of the work Wolla performed for Continental."[49] It props up this headline assertion with a number of ancillary arguments: Continental's assertion that "Wolla Oilfield did not perform the hot oil services that it claimed to perform" is "conclusory," as it fails to identify "*what* those services were, *when* they were billed, *when* they were paid . . ., or *how much* Continental paid," and Continental never alleges that it paid the recent invoices for which it has proffered specific evidence of fraud.[50]

Continental alleges that from January 2017 to the beginning of December 2019, Wolla billed Continental on a biweekly basis for hot oil services it allegedly performed,

---

[48] *See Showler v. Harper's Magazine Found.*, 222 F. App'x 755, 766 (10th Cir. 2007) (A claim for unjust enrichment requires "'enrichment to another coupled with a resulting injustice.'" (quoting *N.C. Corff P'ship, Ltd. v. OXY USA, Inc.*, 929 P.2d 288, 295 (Okla. Civ. App. 1996))).

[49] Def.'s Mot. to Dismiss (Dkt. 28) at 31 (emphasis omitted).

[50] *Id.*

for a total of approximately $7,700,000.00.[51] Continental alleges that a whistleblower revealed a concerted scheme to overcharge customers, like Continental, occurring during that time period. Continental alleges that it subsequently conducted audits and surveillance that corroborated the whistleblower's account. This is more than enough to plausibly allege that Continental paid Wolla for services that were never rendered, which is all that is required at this juncture.

***Conclusion***

For the foregoing reasons, the Court **DENIES** Defendant's Motion to Dismiss (Dkt. 25) and will **CERTIFY** a question to the Oklahoma Supreme Court in an order to follow.

**IT IS SO ORDERED** this 9th day of July 2021.

_____
PATRICK R. WYRICK
UNITED STATES DISTRICT JUDGE

---

[51] Second Am. Compl. (Dkt. 25) at 3.